UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WAYNE NICOLAISON,                                    Civil No. 05-1255 (RHK/JSM)

       Plaintiff,

                                                REPORT AND
v.                                                  RECOMMENDATION

TIM BROWN, ET AL.,

       Defendants.


The above matter is before the undersigned United States Magistrate Judge on defendants' Motion for Summary Judgment [Docket No. 29]; and plaintiff's Motion for Order Placing this Case upon the Court Docket for Jury Trial [Docket No. 44].

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c). For the reasons discussed below, it is recommended that:

1.    Defendants' Motion for Summary Judgment [Docket No. 29] be **GRANTED** in part and **DENIED** in part as follows:

        a.    Defendants' Motion for Summary Judgment be **GRANTED** as to (1) plaintiff's claims for compensatory and punitive damages against defendants in their official capacities; (2) plaintiff's Fourth, Fifth, and Eighth Amendment claims; and (3) plaintiff's action under 42 U.S.C. § 1983 to the extent that he is relying on state law to support this action.

        b.    Defendants' Motion for Summary Judgment be **DENIED** as to (1) plaintiff's claims for declaratory relief against defendants in their official capacities as it relates to their Fourteenth Amendment claim; (2) plaintiff's excessive force claim under the Fourteenth Amendment; and (3) plaintiff's supplemental state claims.

2.      Plaintiff's Motion for Order Placing this Case upon the Court Docket for Jury Trial [Docket No. 44] be **DENIED**, as the presiding judge, District Judge Richard Kyle, will determine when the case shall be scheduled for trial.

## I.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   General Background

Plaintiff, Wayne C. Nicolaison ("Nicolaison"), was first civilly committed as a psychopathic personality in 1992.  See Matter of Nicolaison, No. C1-92-613, 1992 WL 160843 (Minn. Ct. App. July 14, 1992).  At all times relevant to this case, Nicolaison was a patient Minnesota Sex Offender Program ("Program") in Saint Peter, Minnesota.[1] Nicolaison commenced this action seeking relief for alleged violations of certain federal constitutional rights and state law.

On March 10, 2005, Nicolaison alleges that defendant, Matt Schroeder, an employee at St. Peter, brought Nicolaison a new roommate without consulting him on the choice.  See Complaint, ¶¶ 8-9, 11-12.  Nicolaison objected to the roommate on the grounds that he previously had a conflict with the individual, that the individual was a homosexual, rarely showered, stayed up late playing games, and talked to himself.  Id., ¶ 13.

Nicolaison approached Dan Hauger, a staff person at St. Peters, and asked to speak with Schroeder.  See Affidavit of Christopher Vue-Benson ("Vue-Benson Aff."), Ex. 2 ("Nicolaison Dep.") at p. 26.  Hauger told him "no" and proceeded to slam the

---

[1]      Nicolaison is presently a patient in the Minnesota Sex Offender Program in Moose Lake, Minnesota.

guard station door on Nicolaison.  Id. at p. 27.  Nicolaison placed his hand in the door and stopped it from closing and pushed it back open.  Id.  Nicolaison "hollered" at Schroeder asking to talk to him.  Id.  Nicolaison stated that he was angry at this time. Id. Schroeder agreed to talk to Nicolaison.  Id.  at pp. 27-28.

Prior to the meeting with Schroeder, Nicolaison asked another resident in the Program, Anthony Garnett, to be his support person during the operational team meeting, per Program policy.  Id. at p. 28; see also Vue-Benson Aff., Ex. 3 ("Garnett Dep.") at p. 36, 39.  Schroeder escorted Nicolaison to the team room for the meeting. See Nicolaison Dep. at pp. 33-34.  When Nicolaison arrived in the team room with Schroeder, Hauger, defendant Tim Lokensgard, and defendant Tom Rosburg were also in the team room.  Id. at pp. 34-35; see also Garnett Dep. at pp. 40-42, 52.  Defendant Tim Brown was standing outside the door of the team room.  See Garnett Dep. at p. 40. Garnett was also present in the team room.  See Nicolaison Dep. at p. 35.  Nicolaison was expecting to meet with Schroeder and not all of these additional staff members.  Id. at pp. 35-36

Nicolaison was seated in the middle of one of the long sides of the table with his back to the door that opened between the team room and the guard station.  See Nicolaison Dep. at pp. 37-38, 40; Garnett Dep. at pp. 55-56.  Garnett was standing behind Nicolaison off to the side.  See Nicolaison Dep. at p. 40.  Three staff members were seated directly across from Nicolaison at the table in the team room.  See Garnett Dep. at pp. 56.  Nicolaison told Schroeder that he did not want to accept his new roommate.  See Nicolaison Dep. at p. 41.  Nicolaison stated that he was angry when he

was talking to Schroeder and was hollering at him.  Id. at p. 42.  Schroeder told Nicolaison "too bad" and that "sometime in the future we might change it, but at this time this guy is your roommate, and that it was it, it was a closed case."  Id. at p. 41. Nicolaison testified that out of frustration, he started to pick up the table at which he was seated about six inches.  Id. at pp. 42-43.  Nicolaison characterized the table as "little card table", with a wood top, metal frame, and folding legs.  Id. at pp. 42-43, 111. Nicolaison maintained that the three staff members sitting on the other side of the table overturned the table.  Id. at pp. 109-111.  Garnett, on the other hand, testified that Nicolaison overturned the conference table, which he characterized as "quite heavy", and made of solid wood.  See Garnett Dep. at pp. 131-132.  Henry Woodruff, another resident at the Program, who briefly witnessed events at issue through the guard station windows and the door of the team room, stated that the table was made entirely of hard wood and lacked folding legs.  See Vue-Benson Aff., Ex. 4 ("Woodruff Dep.") at pp. 10, 16.  Woodruff also believed that the table was heavy.  Id. at p. 10.

Nicolaison was then tackled to the ground by Brown who came from the hallway adjoining the team room, with a number of other unidentified staff members.  See Nicolaison Dep. at p. 45; Garnett Dep. at p. 62.  Nicolaison characterized the takedown as not hard but that several people began to get on top of him, thereby making it hard for him to breathe.  See Nicolaison Dep. at pp. 58-59.  Nicolaison did not resist the takedown, but told Brown to take his hands off of him and that how he was being restrained was uncalled for.  See Nicolaison Dep. at p. 58; Garnett Dep. at p. 70. Schroeder and Brown were on top of Nicolaison after the takedown.  See Nicolaison

4

Dep. at p. 60; Garnett Dep. at p. 71. Rosburg was standing at this time. See Nicolaison Dep. at pp. 59-60; Garnett Dep. at p. 72.

Garnett stated that once Nicolaison was on the floor, Schroeder, who was in a sitting position, placed his arms around Nicolaison's throat and pulled Nicolaison up to his chest. See Garnett Dep. at p. 74. According to Garnett, both of Schroeder's arms were around the front of Nicolaison's neck with the left fist grabbing the right elbow and the right fist grabbing the left shoulder.[2] Id. at p. 97. Nicolaison claimed that Schroeder had his arms around his neck and was strangling him. See Nicolaison Dep. at p. 60. Nicolaison characterized the strangle as a "headlock", where Schroeder, laying on the side behind and parallel to him, had one of his arms wrapped under Nicolaison's neck and the other arm wrapped around the top his neck, pushing down.[3] Id. at pp. 68-69, 72. Nicolaison asked Schroeder during this time if he was trying to break his neck and complained of neck pain. Id. at p. 74; see also Garnett Dep. at p. 101. Nicolaison testified that Schroeder eased up on the neck hold after this comment. See Nicolaison Dep. at p. 74. Schroeder's arms were around Nicolaison's neck up to the point when Nicolaison was handcuffed. See Garnett Dep. at pp. 98-99.

Garnett testified that after Brown tackled Nicolaison, Brown had his knee on the right side of Nicolaison's neck and that he was twisting Ncolaison's right arm like a rope. See Garnett Dep. at pp. 76, 87-89. Brown also kicked and stomped on

---

[2]    Garnett acknowledged that Schroeder and Nicolaison's backside was facing him when he witnessed these events. See Garnett Dep. at pp. 101, 105.

[3]    This Court notes that Nicolaison also testified that Schroeder was on top of him during the neck hold. See Nicolaison Dep. at p. 69.

Nicolaison's hip, leg, and thigh area.  See Nicolaison Dep. at p. 64; Garnett Dep. at pp. 77, 79; Woodruff Dep. at pp. 24-25.  Nicolaison testified that this happened to his left side; Garnett testified this occurred to Nicolaison's right hip and leg; and Woodruff testified that Brown kicked and stomped on Nicolaison's left hip and leg.  See Nicolaison Dep. at p. 64; Garnett Dep. at p. 84; Woodruff Dep. at p. 25.  Nicolaison communicated to Brown that he was hurting him, and that the way he was being treated was uncalled for.  See Nicolaison Dep. at p. 70; Garnett Dep. at p. 94.  Garnett testified that Brown was wearing some type of work boot and that he was kicking Nicolaison hard enough to injure and cause bruising.  Id. at p. 95.  Woodruff also testified that the force applied by Brown was enough to cause bruising.  See Woodruff Dep. at p. 26.

After Brown stopped kicking Nicolaison,[4] but still while Schroeder was "strangling" him, Rosburg, while standing,[5] had a hold on Nicolaison's foot and began to twist his left leg back and forth.  See Nicolaison Dep. at pp. 74-76; Garnett Dep. at pp. 107, 109.  Nicolaison testified that Rosburg was twisting his leg outward and to the left.  See Nicolaison Dep. at p. 76.  Garnett testified that Rosburg was on Nicolaison's back while he twisted Nicolaison's ankle.  See Garnett Dep. at p. 113.  Nicolaison's leg was being bent more at the ankle than at the knee, however, Garnett opines that because of the manner the leg was being twisted their was probably damage done to the knee and

---

[4]     Both Garnett and Woodruff testified that Brown was still kicking Nicolaison during the leg twist by Rosburg.  See Garnett Dep. at p. 114; Woodruff Dep. at p. 31.

[5]     While Nicolaison testified he was laying on his side and that he believed Rosburg was standing during this period, Garnett testified that Nicolaison was face down with Rosburg on Nicolaison's back.  See Garnett Dep. at pp. 110, 111-112.

the ankle.  Id. at p. 112.   Woodruff testified that he observed Rosburg sitting on the ground with Nicolaison's right leg and foot.  See Woodruff Dep. at pp. 28-30.  Woodruff claimed that Nicolaison's leg was bent at the knee and that Rosburg was twisting his foot.  Id. at p. 30.  Nicolaison stated that he was hollering, "you're hurting me" and that he was trying to scream, while Garnett testified that Rosburg looked like he was enjoying what he was doing.  See Nicolaison Dep. at p. 77; Garnett Dep. at p. 107.

Nicolaison also testified that someone was twisting his right arm, but that he did not see who it was.  See Nicolaison Dep. at p. 78.  He subsequently stated that did not recall feeling someone twisting his arm.   Id. at pp. 78-79.   Garnett stated that Lokensgard was the individual who twisted Nicolaison's arm.  See Garnett Dep. at p. 125.  Garnett claimed that this occurred at the same time Nicolaison was being choked, stomped on and having his leg twisted.  Id. at pp. 125-26.  Nicolaison testified that his arm was not really injured but may have been a little sore (although he could not recall) and did not know if it was from the twisting or from falling down.  See Nicolaison Dep. at pp. 78-79.  Woodruff only testified that Lokensgard assisted in pinning Nicolaison to the floor, and made no mention of Lokensgard twisting Nicolaison's arm.  See Woodruff Dep. at pp. 31-33.

Once Nicolaison was handcuffed, he was pulled to his feet, and he walked on his own with help from staff to protective isolation. See Nicolaison Dep. at p. 84; Garnett Dep. at pp. 127, 138, 140. Garnett observed Nicolaison walking with a heavy limp during this time.  See Garnett Dep. at p. 138.  A nurse came to see Nicolaison while in protective isolation, and he asked for pain medication and to see a doctor, but other

staff members said that nothing was wrong with him, so the nurse left.  <u>See</u> Nicolaison Dep. at p. 93.  Nicolaison only saw a nurse when he was transferred to a different unit and an x-ray was taken.  <u>Id.</u> at p. 94.  Nicolaison also saw a doctor while in St. Peters, who told him that the x-ray did not reveal any breaks to his leg.  <u>Id.</u> at p. 100.  The doctor refused to prescribe him any pain medications or crutches.  <u>Id.</u>  Once he was transferred to Moose Lake, a doctor prescribed Nicolaison with pain medications and crutches.  <u>Id.</u> at p. 101.

When Nicolaison was asked about the injuries he suffered, he stated that the main injury he suffered, other than being strangled, was to left hip joint in the form of swelling, which limited his movement, however, Nicolaison acknowledged that there was no bruising.  <u>Id.</u> at pp. 95, 96, 97.  He stated that he believed either Brown or Rosburg were responsible for the injury to the hip.  <u>Id.</u> at p. 97.

## II.    SUMMARY OF NICOLAISON'S CLAIMS IN HIS COMPLAINT

In his Complaint, Nicolaison alleged, pursuant to 42 U.S.C. § 1983, that defendants' actions of kicking, stomping, strangling, and twisting constituted excessive force in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  <u>See</u> Complaint at p. 7.  Further, Nicolaison claimed that these actions by defendants violated the contemporary standards of decency of a medical health facility under the Fourth Amendment, as the use of unreasonable force.  <u>Id.</u>  In addition, Nicolaison alleged that defendants' actions constituted abuse under Minnesota Statutes §§ 144.651, subd. 14 (1992); 245a.68; 626.577; and Minnesota Legislative Rule 9555.8000-9500 (2005).  <u>See</u> Complaint at p. 7.  Nicolaison's claims for includes

that the Court declare that: (1) defendants' actions of kicking, stomping, strangling, and twisting constituted excessive force in violation of the Fourth and Fourteenth Amendments; and (2) defendants' actions of kicking, stomping, strangling, and twisting constituted cruel and unusual punishment in violation of the Fifth and Eighth Amendments.   See Complaint at p. 8.   In addition, Nicolaison has asked for compensatory and punitive monetary damages. Id.

## II.    DISCUSSION

In support of their motion for summary judgment, defendants argued that Nicolaison's suit should be dismissed on the grounds that they are entitled to Eleventh Amendment immunity in their official capacities; that Nicolaison's various constitutional claims fail on summary judgment; and that this Court should decline supplemental jurisdiction to Nicolaison's state claims.

### A.    Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.  "'Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995). If the evidence is "merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

### B.    Claims for Monetary Damages Against Defendants In Their Official Capacities

Defendants argued that the Eleventh Amendment to the United States Constitution bars Nicolaison from obtaining monetary damages against them in their official capacities. See Memorandum of Law in Support of Defendants' Motion for

10

Summary Judgment ("Defs.' Mem.") at pp. 5-6.  The Eleventh Amendment states that the "judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state."   Under the Eleventh Amendment, federal courts do not have subject matter jurisdiction over a claim against a state for damages that has not consented to the suit.  Seminole Tribe of Florida v. Florida, 517 U.S. 44, 64-65 (1996); see also Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238-40, 105 S.Ct. 3142 (1985) (under the Eleventh Amendment, federal courts lack subject matter jurisdiction over lawsuits against states unless the state has consented to the suit or Congress has unequivocally abrogated its Eleventh Amendment immunity).  This immunity extends to state officials as well since "a suit against a state official in his or her official capacity is a suit against the official but rather is a suit against the official's office [and] is no different from a suit against the State itself."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989); Roberts v. Dillon, 15 F.3d 113, 115 (8th Cir. 1994) ("An official-capacity suit is merely another way of pleading an action directly against the public entity itself.").  When a lawsuit is barred by the Eleventh Amendment, the case must be dismissed for lack of subject matter jurisdiction.  Seminole Tribe, 517 U.S. at 64-65.

In his Complaint, Nicolaison has brought suit against the defendants for compensatory and punitive damages, however, the defendants have not consented to such a suit.   As such, the Eleventh Amendment bars Nicolaison's claims against defendants in their official capacities and this Court lacks jurisdiction over such claims.

Defendants' motion for summary judgment should be granted as to Nicolaison's damage claims against them in their official capacities.[6]

## C. Claims of Constitutional Violations Against the Individual Defendants in their Individual Capacities

### 1. Fourth Amendment Claims

Nicolaison maintained that defendants' actions of kicking, stomping, strangling, and twisting constituted excessive force in violation of the Fourth Amendment. See Complaint at p. 7. In addition, Nicolaison claimed that these actions by defendants violated the contemporary standards of decency of a medical health facility under the Fourth Amendment, as the use of unreasonable force. Id.

Plaintiffs' case is an excessive force claim. In Andrews v. Neer, 253 F.3d 1052 (8th Cir. 2001), the Eighth Circuit determined that a civilly committed person's:

> [E]xcessive force claim does not fit neatly into an analysis based on the status as an arrestee, a pre-trial detainee, or a prisoner. Bobby Andrews was held in Fulton after having been found not guilty of murder by reason of insanity, and thus he was not a 'prisoner' subject to punishment . . . His confinement in a state institution raised concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facilities operations . . . Accordingly, we conclude that Andrews's excessive force claim should be evaluated under the . . . standard usually applied to excessive force claims brought by pretrial detainees.

---

[6]   Defendants have not claimed that the Eleventh Amendment bars Nicolaison's requests for declaratory judgments against them. Further, this Court notes that the Eleventh Amendment does not bar Nicolaison's request for declaratory judgment with regards to his constitutional rights. See Dakota, Minnesota & Eastern Railroad Corp., 362 F.3d 512, 517 (8th Cir. 2004) (citation omitted); see also Klinger v. Director, Dept. of Revenue, 281 F.3d 776, 777 (8th Cir. 2002) (per curium).

Andrews, 253 F.3d at 1061 (citations omitted) (emphasis added); see also Meyer v. O'Keefe, No. 03-5251, 2004 WL 2212091 at *3 (D. Minn. Sept. 30, 2004) (finding that same due process standard used for pretrial detainees should be applied to a committed sex offender).

The evaluation of excessive-force claims brought by pre-trial detainees are grounded in the Fourteenth Amendment rather than the Fourth Amendment. Freeman v. Jackson, No. 95-3870, 107 F.3d 875, 1997 WL 61226 at *1 (8th Cir. Feb. 14, 1997) ("As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment.") (citing Graham v. Conner, 490 U.S. 386, 395 & n. 10 (1989)); Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir. 1997) (en banc) (citation omitted) ("[E]xcessive force claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment.").   In fact, plaintiff has acknowledged that the appropriate standard of review for his excessive force claim is under the due process clause of the Fourteenth Amendment.   See Plaintiff Memorandum of Law in Support to Deny Defendants' Motion for Summary Judgment ("Pl.'s Mem.") at p. 4.

As such, Nicolaison's excessive and unreasonable use of force claims are governed by the Due Process Clause of the Fourteenth Amendment and not the Fourth Amendment.  As such, this Court finds that summary judgment as it relates Nicolaison's claims under the Fourth Amendment should be granted and that the claims should be dismissed with prejudice.

**2.      Fifth and Eighth Amendment Claims**

Nicolaison claimed that defendants violated his Fifth and Eighth Amendment rights because defendants' actions of kicking, stomping, strangling, and twisting constituted cruel and unusual punishment.  <u>See</u> Complaint at pp. 7-8.  Defendants argued that Nicolaison's Eighth Amendment claim should be dismissed because the Eighth Amendment's prohibition only applies to punishment imposed for the conviction of a crime.  <u>See</u> Defs.' Mem. at pp. 7-8.

"After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986).   Because Nicolaison was a civilly committed patient, his claim does not directly implicate the Eighth Amendment proscriptions against cruel and unusual punishment; rather, it is a due process claim. <u>See</u> <u>Youngberg v. Romeo</u>, 457 U.S. 307, 316-317 (1982) (the Supreme Court analyzed the rights of an involuntarily confined individual under the Due Process Clause, rather than under the Eighth Amendment); <u>see</u> <u>also</u> <u>Ingraham v. Wright</u>, 430 U.S. 651, 671, n. 40 (1977) (finding that the Eighth Amendment's protections do not attach until after conviction); <u>Revels v. Vincenz</u>, 382 F.3d 870, 874 (8th Cir. 2004) (citations omitted) ("because an involuntarily committed psychiatric patient is confined for treatment rather than incarcerated for the purpose of punishment following conviction, the Eighth Amendment does not apply.").

There is no dispute that Nicolaison is presently civilly committed as opposed to being incarcerated for the commission of a crime.  Therefore, the Eighth Amendment

protections do not apply to him and defendants' motion for summary judgment on those claims in his Complaint arising under Eighth Amendment should be granted.   Further, defendants should also be granted summary judgment as to Nicolaison's Fifth Amendment claims as they are state and not federal actors.   See Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 158 (1896) ("The fifth amendment . . . applies only to the federal government, as has many times been decided."); see also Jones v. City of Jackson, 203 F.3d 875, 880 (5th Cir. 2000) ("The Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor.").   Nicolaison's Fifth and Eighth Amendment claims should be dismissed with prejudice.

### 3.      Due Process Claims Under the Fourteenth Amendment

It is also  Nicolaison's position that defendants' actions of kicking, stomping, strangling, and twisting constituted excessive force or restraint in violation of the due process clause of the Fourteenth Amendment.   See Complaint at pp. 7-8.   As stated previously, Nicolaison's excessive force claims are grounded in the Fourteenth Amendment and must evaluated by this Court under the objective reasonableness standard usually applied to excessive force cases brought by pretrial detainees.   See Andrews, 253 F.3d at 1061 (holding that an excessive-force claim from any involuntarily committed state hospital patient should be evaluated under the same standard as an excessive-force claim brought by a pretrial detainee).   In particular, the excessive force claims brought by Nicolaison are governed by substantive, not procedural, due process. See Williams-El v. Johnson, 872 F.2d 224, 229 (8th Cir. 1989) (string citation omitted).

Substantive due process "'bar[s] certain government actions regardless of the fairness of the procedures used to implement them, . . . [and thereby] serves to prevent governmental power from being 'used for purposes of oppression.'" Fitzgerald v. Williamson, 787 F.2d 403, 407 (8th Cir. 1986) (quoting Daniels v. Williams, 106 S.Ct. 662, 665 (1986), quoting Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 277, 59 U.S. 272, 277, 15 L.Ed. 372 (1856)).  Nicolaison's substantive due process claim is governed by the Supreme Court's decision in Youngberg v. Romeo, supra, which involved an involuntary commitment.  There, the Supreme Court held "[i]n determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance the liberty of the individual against the relevant interests of the state."  457 U.S. at 321.

The test set forth by Youngberg, provides that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."  Id. (citation omitted).  According to the Supreme Court, the due process clause protects against "arbitrary" action of the Government, which in terms of substantive due process pertains to "the exercise of power without any reasonable justification in the service of a legitimate governmental objective, . . ."  County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998) (citing Daniels v. Williams, 474 U.S. 327, 331 (1987)).  "'[T]he appropriate standard was whether the defendants conduct was 'such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of [the] plaintiff as to demonstrate that

the defendants did not base their conduct on a professional judgment.'" Heidemann v. Rother, 84 F.3d 1021, 1029 (8th Cir. 1996) (quoting Youngberg, 457 U.S. at 314).  The Eighth Circuit has further stated:

> The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency.[7] Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose or those that are rationally related but are excessive in light of their purpose.

Johnson-El, 878 F.2d at 1048 (citing Bell v. Wolfish, 441 U.S. 520, 538 n. 20 (1979)).

In this case, defendants argued that they are entitled to summary judgment on Nicolaison's excessive force claim because his testimony and the testimony of two other patients, who claimed to have witnessed the events at issue in this case, are plagued with "inconsistencies" regarding what took place during Nicolaison's take down.  See Defs.' Mem. at pp. 8-10.  In addition, defendants argued that summary judgment is appropriate as the force applied by defendants was not excessive.  Id. at pp. 21-23. This Court will proceed with analyzing plaintiffs' due process claim as to each defendant.

### a.   Defendant Schroeder

With regards to Schroeder, defendants argued there were inconsistencies between the testimony of Nicolaison and Garnett, as well as internal inconsistencies in both their depositions, regarding to the neck hold placed on Nicolaison.  Id. at pp. 10-14.

---

[7]   This Court notes that "[a]lthough an involuntary committed person at a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner."  Revels, 382 F.3d at 874.

However, there are two consistencies based on the testimony before the Court.  First, there is no dispute in Nicolaison and Garnett's testimony that Schroeder placed Nicolaison into some sort of neck hold.  See Nicolaison Dep. at pp. 60, 68-69, 72; Garnett Dep. at pp. 74, 97-99.  Defendants have not provided an affirmative statement from Schroeder, or any other evidence, demonstrating that that Schroeder did not place Nicolaison into some sort of neck hold on March 10, 2005.  Second, both Nicolaison and Garnett testified that Nicolaison was complaining to Schroeder of neck pain.  See Nicolaison Dep. at p. 74; see also Garnett Dep. at p. 101.  What is missing is any testimony or evidence as to why the neck hold by Schroeder was initially necessary or why it was required up to the point of restraint.  While Garnett testified that Nicolaison overturned the table, Nicolaison argued that he only picked up the table six inches and that the staff jumped him and overturned the table.  See Nicolaison Dep. at pp. 42-43, 109-111; Garnett Dep. at pp. 131-132.  This is an issue a fact that cannot be decided on summary judgment.[8]  Further, there is no evidence in the record that Nicolaison was fighting with staff members during their efforts to restrain him; only that he voiced his pain and displeasure to staff.  In fact, Nicolaison testified that he was not fighting or resisting the takedown by staff members.  See Nicolaison Dep. at p. 58.  In other words,

---

[8]     With regards to inconsistencies between the testimony of Nicolaison and Garnett, in the summary judgment context, we do not resolve credibility disputes.  See Mershon v. St. Louis University, 442 F.3d 1069, 1075 (8th Cir. 2006) (citation omitted); see also Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Yates v. Rexton, Inc., 267 F.3d 793, 800 (8th Cir. 2001) (finding that "a district court is prohibited from making a credibility judgment or a factual finding from conflicting evidence.").

this Court does not have anything from Schroeder, except for the arguments and speculation by his counsel (see Defs.' Mem. at pp. 22-23), that his actions were rationally related to a legitimate purpose (i.e. safety or security) or that they were not excessive, given the events of March 10, 2005.  This Court will not speculate on behalf of defendants as to how or why they took the particular action they did in this case.[9]

Defendants also asserted that Nicolaison does not have an excessive force claim under the Fourteenth Amendment against Schroeder because Nicolaison testified that he did not have any bruises, swelling, or other signs of injury on his neck.  See Defs.' Mem. at p. 11.  When asked about any injuries he suffered, Nicolaison stated that other than being "strangled", he suffered swelling in his hip area.  See Nicolaison Dep. at p. 97.  However, even to the extent that Nicolaison did not suffer any injury to his neck, Schroeder is not automatically entitle to summary judgment, "as proof of actual damages is unnecessary to a establish a constitutional violation. . . ."  Bolin v. Black, 875 F.2d 1343, 1350 (8th Cir. 1989), cert. denied, 493 U.S. 993 (1989); see also Slicker v. Jackson, 215 F.3d 1225, 1231-32 (11th Cir. 2000) (citations omitted) (holding in § 1983 excessive force case that district court erred in granting judgment for defendant as a matter of law on plaintiff's § 1983 claim alleging violations of the Fourth, Fifth, and Fourteenth Amendments because "a § 1983 plaintiff alleging excessive use of force is entitled to nominal damages even if he fails to present evidence of compensable injury.").

---

[9]      Defendants have failed to provide any of their own affidavits or testimony in support of their positions.

For the reasons stated above, this Court finds that Schroeder's motion for summary judgment as to Nicolaison's excessive force claim under the Fourteenth Amendment should be denied.

b.   Defendant Brown

Defendants argued that Brown is entitled to summary judgment on Nicolaison's excessive force claim as Nicolaison, Garnett, and Woodruff provided accounts on the kicking and stomping that cannot be reconciled.   See Defs.' Mem. at p. 21.   As a preliminary matter, as this Court found with Schroeder, inconsistencies in testimony and credibility cannot be resolved on summary judgment.   See n. 8, supra.   Further, Nicolaison, Garnett, and Woodruff all testified that Brown kicked and stomped on Nicolaison's hip, and leg.[10]   See Nicolaison Dep. at p. 64; Garnett Dep. at pp. 77, 79; see Woodruff Dep. at pp. 24-25.   Nicolaison communicated to Brown that he was hurting him and that the way he was being treated was uncalled for.   See Nicolaison Dep. at p. 70; Garnett Dep. at p. 94.   Further, both Garnett and Woodruff testified that Brown kicked Nicolaison hard enough to cause bruising.   See Garnett Dep. at p. 95; Woodruff Dep. at p. 26.   Again, there is no evidence that Nicolaison was resisting staff's attempts to restrain him when this conduct was occurring.

This Court cannot find that judgment should be entered as a matter of law that Brown's kicking and stomping Nicolaison was rationally related to restraining Nicolaison for staff and patient safety and security, as opposed to being a punitive measure, based

---

[10]   Woodruff later testified that he believed Brown kicked Nicolaison in the hip and knee area.   See Woodruff Dep. at p. 26.

on the facts before the Court.  Even if Nicolaison had tipped over the table, which is in dispute, an issue of fact remains as to whether kicking and stomping was an excessive method of restraining Nicolaison, given that this Court has no evidence before it as why this sort of force was necessary.  This Court is not attempting to substitute its judgment for the judgment of the staff, however, this Court has nothing before it to show why Brown engaged in the level of conduct that is alleged in this case.  As such, this Court finds that Brown's motion for summary judgment as to Nicolaison's excessive force claim under the Fourteenth Amendment should be denied.

c.   <u>Defendant Rosburg</u>

Again, defendants argued that the inconsistencies between the testimony by Nicolaison, Garnett, and Woodruff make it so no reasonable jury could find that he used excessive force against Nicolaison.  <u>See</u> Defs.' Mem. at pp. 17-18.  Defendants focused on the differing accounts by the witnesses as to where Rosburg was when twisting Nicolaison's leg, when the leg was twisted by Rosburg, and what part of leg was being twisted.  <u>Id.</u>  However, there is no dispute between the three witnesses that Rosburg twisted some portion of one of Nicolaison's legs on March 10, 2005 (<u>see</u> Nicolaison Dep. at pp. 74-76; Garnett Dep. at pp. 107, 109, 113; Woodruff Dep. at pp. 28-30), and this Court will not resolve inconsistencies of testimony on summary judgment.  Further, Nicolaison testified that he was hollering, "you're hurting me" and that he was trying to scream, while Garnett testified that Rosburg looked like he was enjoying what he was doing.  <u>See</u> Nicolaison Dep. at p. 77; Garnett Dep. at p. 107.

21

What is lacking, as with the other defendants, is why this application of force was necessary. Defendants provided no evidence that leg twisting is a suitable method of restraint or that it was even necessary in this particular case. As such, this Court cannot find as a matter of law that summary judgment should be granted as to Nicolaison's excessive force claim against Rosburg under the Fourteenth Amendment.

### d.   Defendant Lokensgard

Defendants argued that a jury could not find that Nicolaison suffered any injury to his arm[11] or that excessive force was used to restrain his arm. See Defs.' Mem. at p. 14. Defendants also argued that the witnesses' differing accounts of what occurred as to Lokensgard entitles him to summary judgment. Id. at pp. 14-16.

Nicolaison alleged in his Complaint that, "[d]efendant Lokensgard as recorded by Witness Anthony Garnett, was at this time twisting the Plaintiff's arm in a painful manner." See Compliant at p. 6, ¶ 25. Nicolaison's own testimony was that someone was twisting his right arm, but that he did not see who it was. See Nicolaison Dep. at p. 78. Nicolaison also stated that he was going by Garnett's account of what happened, and did not himself recall feeling someone twisting his arm given the stress and other pain being inflicted on him. Id. at pp. 78-79. Garnett stated that Lokensgard was the individual who twisted Nicolaison's arm by placing one hand on the wrist, with Nicolaison's arm out, and twisting right or left. See Garnett Dep. at p. 125. On the other hand, Woodruff only testified that Lokensgard assisted in pinning Nicolaison to the

---

[11]    As stated previously, proving an injury is not necessarily required to maintain a constitutional claim under § 1983. See Bolin, 875 F.2d at 1350; see also Slicker, 215 F.3d at 1231-32.

floor, and made no mention of Lokensgard twisting Nicolaison's arm.  <u>See</u> Woodruff Dep. at pp. 31-33.

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." <u>Clark v. Kellogg Co.</u>, 205 F.3d 1079, 1082 (8th Cir. 2000).   There has been no claim by Lokensgard that he did not twist Nicolaison's arm.   To the extent there is conflicting claims by Garnett and Woodruff as to whether Lokensgard twisted Nicolaison's arm, this is a dispute of fact that cannot be addressed at summary judgment.   Nicolaison has relied on Garnett's claim that Lokensgard twisted his arm while Brown was stomping on Nicolaison, Schroeder was choking Nicolaison, and Rosburg was twisting his leg.  <u>See</u> Nicolaison Dep. at pp. 78-79.   Garnett's testimony is enough to overcome summary judgment and if a jury does conclude that Lokensgard did twist Nicolaison's arm, there is no evidence before the Court to show why it was appropriate given the circumstances of this case.   Lacking such evidence, this Court cannot grant defendants' motion for summary judgment as to the excessive force claim against Lokensgard.

### D.   <u>State Claims</u>

Nicolaison asserted in his Complaint that defendants' actions constituted abuse under Minnesota Statutes §§ 144.651, subd. 14 (1992); 245a.68; 626.577; and Minnesota Legislative Rule 9555.8000-9500 (2005).  <u>See</u> Complaint at p. 7.   To the extent that Nicolaison is asserting that these state claims support his § 1983 cause of action, Nicolaison's § 1983 claims should be dismissed, as he cannot seek relief in

federal court under § 1983 based on alleged violations of Minnesota laws or correctional policies.  See Nicolaison v. Milczark, 26 Fed. Appx. 596, No. 01-3084, 2002 WL 15669 at *1 (8th Cir. 2002) (citing Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996); Treleven v. Univ. of Minn., 73 F.3d 816, 819 & n. 4 (8th Cir. 1996)); see also Schwindling v. Smith, 777 F.2d 431, 433 (8th Cir. 1985).  This is because "a violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983."  Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir.1996) (citation omitted).  Therefore, Nicolaison's claims under these state laws should be dismissed for failure to state a claim for relief under § 1983.

To the extent that Nicolaison is only asserting independent state law claims, defendants have only argued that because summary judgment on all of Nicolaison's federal claims should be granted, the Court should also decline to exercise supplemental jurisdiction over these possible state law claims.  See Defs.' Mem. at p. 24.  Since this Court has not granted defendants' motion for summary judgment on all of Nicolaison's federal claims, this Court cannot recommend that Nicolaison's state law claims be dismissed.

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.   Defendants' Motion for Summary Judgment [Docket No. 29] be **GRANTED** in part and **DENIED** in part as follows:

      a.   Defendants' Motion for Summary Judgment be **GRANTED** as to (1) plaintiff's claims for compensatory and punitive damages against

defendants in their official capacities; (2) plaintiff's Fourth, Fifth, and Eighth Amendment claims; and (3) plaintiff's action under 42 U.S.C. § 1983 to the extent that he is relying on state law to support this action.

b.      Defendants' Motion for Summary Judgment be **DENIED** as to (1) plaintiff's claims for declaratory relief against defendants in their official capacities as it relates to their Fourteenth Amendment claim; (2) plaintiff's excessive force claim under the Fourteenth Amendment; and (3) plaintiff's supplemental state claims.

2.      Plaintiff's Motion for Order Placing this Case upon the Court Docket for Jury Trial [Docket No. 44] be **DENIED**, as the presiding judge, District Judge Richard Kyle, will determine when the case shall be scheduled for trial.

Dated:        February 6, 2007

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 23, 2007**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.